May it please the Court, I'm Dennis Martin. I'm with Wilmore Holbrow, my colleague, and we represent the County of Los Angeles in the Los Angeles Sheriff's Department. What I'd like to do here is focus primarily on the fair use defense, because that is the defense that if we prevail on, we're unlikely to have to go through another trial. What did you buy? We bought 2,000 copies of this terminal emulation software. And what does each copy consist of? You bought 2,000 of them. What does one copy consist of? It consists of several physical CDs that were provided with us and whatever, 1,997 virtual copies. Virtual copies don't get delivered because there's no reason to do that. I mean physical copies don't get delivered. One copy costs how much? If I had one little dinky computer and I wanted to buy, I wanted to equip it with this capacity, I'd buy one, right? Yes. And how much would it cost? Everything's negotiable, but a couple hundred bucks. Now, if you're right, what would prevent the United States Department of Justice from buying one of these for a couple hundred dollars and then replicating it 600,000 times for all of its computers throughout the entire country? Nothing. Anybody can do that. It would be a serious... And you'd argue there's nothing wrong with that? I would argue that there's a serious copyright infringement involved in that. Well, isn't that what you did? You bought a few and then you figured out a very clever way, and I don't mean that to be critical, of installing these on all kinds of computers without paying the fee that's required for each one. That's right. Assuming that a fee is required for those that can never be used. That's where we get into a fair use. Your position seems to be we can buy one of these and then we can run it off on all 6,000 computers and we only owe you 85 bucks. That's absolutely not our position. That's dead contrary to our position. In your favor, why isn't that necessarily the result? Because of what the fair use defense means in reality and what this circuit has done over and over again in deciding issues of adapting copyright law to technology, where fair use is the main tool. There are lots of things that you can do in making copies. In fact, Professor Mr. Nimmer, why'd you buy 2000 and then why'd you buy five and then come up with this clever way of installing it on all the computers? You have to understand that this is terminal emulation software. That's only use is this is to connect with the host computer. If I can use an analogy, a simple one. If you buy an airline ticket and don't have a boarding pass, you're not going to get on the plane. We use. I understand that. But you bought 2000 of them and your intention was originally to install them, I suppose, in 2000 individual computers. And somebody found out, hey, this is taking a whole lot of time, effort and energy. And so they came up with a very clever way to jump all that individual installation and install it all at once on a whole bunch of them. That's right. It seems to me that you didn't need 2000 copies to do that. You can use one copy. So if we rule in your favor, they buy one copy and they can run it off on 600 million. I think, Judge Trott, that that confuses physical copies with the conceptual copies that we bought in buying 2000 copies when all we got was one CD. I know, but you bought 2000 licenses. Right. It seems to me that the understanding of everybody was that that would cover 2000 individual computers. Am I wrong? Oh, that is wrong. There was a conversation right at the outset. This is a disputed fact. It wouldn't lead to summary judgment. But the testimony of the Lieutenant Salveson was that he took the salesperson aside. And before we even installed anything and said, here's what we're doing. We control our we control our use by the other side disputes that I saw. Yeah, they dispute that. There was a conversation also at the next purchase with Dorothy Truesdale. There were two conversations with the. But could you not just buy one copy? And then do exactly what you did not under our legal theory. Oh, could you. Well, as a matter of installation. Sure, you can. And I thought your theory, your theory boils down to that. Really, all we need to do is buy one and then it's fair use to run it off on 6000. Absolutely. Absolutely not. If you're talking about copies, we're just distinguishing between copies that cannot be used in any way, shape or form for the terminal emulation purpose. Because if you don't have the ticket at an individual computer to get to a host, there's no use for the software. And we told them about that. We told them that we were doing that. What that does is wind up with us having a more efficient way of installing the software and a fail safe, a fail safe way of preventing overuse of the software to illustrate. We had a devil of a time even coming up with the number of computers in the sheriff system. We had to go back to invoices for computer purchases, but we had no trouble at all coming up with the number of computers that had the software on it because you could do that automatically and efficiently by getting the number off the computer system. So we had a superb and extremely efficient way of making sure that we did not overuse the software. It's almost unique to terminal emulation because the only use is when you're connecting up to a host computer. So you installed it everywhere, but you limited the capacity to use it to the number that you purchased. Through the same security system that was in place necessarily at the sheriff's department to keep people from unauthorized people from getting into jail information. It was extremely sophisticated and certain system where if you were not at a computer that had the access, you're not going to get into the information that can open jail doors for people. So the. So the access is is in the capacity to access is in the computer. There's a system of assignment. Go ahead. Maybe I'm answering more than you want. There's an assignment of what's called the logical unit in the host computer that in effect is an electronic password. If the computer that tries to connect doesn't answer with its answer, that's on the list of logical units that the host computer has. You can't get through. You can't get to the databases. So it's programmed into the computer. Right. To the mainframe host host computer. Yeah. And and the corresponding computers that have the are entitled to get on, respond with a signal basically that, yes, this is our number. We're entitled to get into the end of the mainframe. So. Why we think this is a fair use is really follows from a string of this court's decisions. And this court has led the way in applying fair use to technology. I think that's because both Hollywood and Silicon Valley are in the circuit. But what has happened, I think, is that this court very ably applied traditional fair uses, parody type fair uses, sharpened what the four factors meant and fitted them to the technology situation. And what it has done with that is I think I don't think I have to go through the four factors individually, but I think what they come down to is if the use that the copier is using the product, whatever it is, in a way that doesn't gore the ox of the copyright holder, doesn't damage, occupy the copyright holders market, doesn't impinge on its pocketbook in any way, doesn't actually use the intrinsic copyright itself, property right in the in the material, then it's very likely to be held a fair use. Professor Nimmer, again, Mr. Nimmer, talks about situations where the only one of the six exclusive copyright rights is copying itself. That is copying without making a derivative work, copying without public display, et cetera, et cetera. But purely making a copy is likely to be or is likely is too strong a word, is prone to be a fair use and compels the court to look closely at what actually is going on with that mere making of a copy. Here we made the copies, no question. Technically, Judge Trott, I would agree it's a copyright infringement, but that's why you have fair use, because fair use is there to prevent over-technical applications of the copyright law from leading to results that don't make any sense. What is the leading case in this circuit that you want us to follow? There are really, because the facts vary and it's hard to, there's not one case that says you can do this, but I think the most persuasive ones are the Seagiver versus Acolade case, where an unauthorized copy was made and it was used to reverse engineer to design a competing product. If I'm running a college and I've got a thousand students taking a course and I buy one copyrighted book that I intend for one student, and I make 999 copies of it and I give the 999 copies to the rest of the students, is that fair use? No. Absolutely not. No. You bought 2,000 of these. Each one was to a dedicated workstation. The amount of money to be paid for each was calculated on that basis, and then you replicated the thing through hard disk imaging or whatever it's called, and you ran it off on 6,000. It strikes me as very similar in taking one copy of a book, making a bunch of copies, and giving it to the rest of the students. It's not similar because there's no, in your hypothetical, there's a use of the copies. You're not only copying, you're distributing. You're displaying. You're making, if not making money, at least saving money by doing it. These were workstation specific. Each one was to be installed at a specific seat workstation, and every time you put it into a different one, the cash register clunked another chunk, and you figured out a way to avoid that. Oh, that's their position. There's nothing to support that position. In fact, much of the evidence that was excluded was evidence to the effect that in other situations where this company came up with similar issues, they said, go ahead and do it. It doesn't gore our ox. Somebody made actually an equal number of, well, I won't get into the details of what each one did. You got a per station deal. Absolutely. And we're counting stations by stations that could use the software, and that's where fair use comes in. The SIGA plaintiff had no license to copy the one. The other case that I think is very interesting and applicable is the Kelly versus Areva case where someone made a miniaturized version of a painting, copyrighted image, used it as an index on the Internet to enable people to get to whatever site they wanted to get to to view art. Why don't you use a book analogy and explain this, using a book analogy. Well, take it this way. If I made 100 copies of a copyrighted work, unauthorized, and bound the books together and used them as doorstops, I think that's a fair use. There's not much public benefit in it. But you're not using the copyrighted work. By that, I mean the copyright and the copyrighted work. The value that what the copyright law protects is the intellectual property that the copyright holder has in the in the work. When you put software on a case like this. I'm sorry. There's a case like this somewhere. Oh, absolutely. The book stopped. It's built. It's built. Actually. The. Yes. Books would have been better as doorstops than books. If you opened them, you were infringing. If you were able to open them, you were infringing. The copyright law doesn't check to see whether anybody reads the book or not. It's just assumed. But here you can't read it. You can't. You can't even get to a host computer with that software. It's just lying there. They could have been taken off. The excess ones could have been taken off when they were installed. There was no real reason to do it. I'm not following you. You're saying they were there. So what. Right. Well, then why were they there? Because that was the residue of the process of hard disk imaging. Every computer that came into the sheriff's office with the capacity should sometimes at some point you want to use it. Well, more than that, because a whole suite of software was put on the hard disk imaging. The way it works is you take all the software that the deputy is likely to ever need. Windows, whatever other software is there. There is on it and establish it as a software baseline that you just hard disk image onto all the computers in the system. And you can do it virtually if that's what you want to do. They had like 30 different baselines. You just bought one. If you bought one. They did just buy one, I guess, and a license to use it on. Right. We count our uses by the. Yeah. But you get about one with one license. To what I was. But you'd be infringing as soon as you put that on. And you agree that if you put it on the computer that you're going to use with the book analogy, if you buy 30 books because you have 30 students in the class now, but you make a hundred copies of it in order to make sure that if you have more students, you you have copies of them. Is that that's not fair use, is it? No, it's a difference between books and software. And that's what exactly the kind of questions that the Ninth Circuit has been answering over and over again in a very consistent fashion. And the the bling case, the Sony Connectix case, Kelly versus Ariba, which is interesting because there are thousands of images being caught being made every time that somebody accesses that software. But the court says, even though that's an exact reproduction of the original, it can't really be used as a painting. All it is is an indexing device. And that is a transformative use. It's an indexing device. So you can go look at the painting somewhere else. Was this copying for a commercial purpose? No, that is. But you see, I just I still don't understand why you might not have want to have the same capacity on different computers at a different time. Why you might mean you you're saying you only you don't you only you only hook this up to 200 computers, even though they've all got. Well, the goal never, never completely achieved. But the goal is to have the same software profile at every computer. So you've got tremendous flexibility that you have the capacity to use all of those computers for this. It's the flexibility. I'm not quite sure I've seen the difference between the analogy of having the extra books in case you you have a different size class next year. There's a big difference between a book that you can take and read and a piece of software that's lying dead on a computer that can't be used for anything. Well, and the reason I'm not sure if you've got it there. It's there because that's the only way to efficiently load the software. It's simple as that. You have to in order to achieve the savings of the hard disk imaging. I'm usable as what it's supposed to be on that computer. Absolutely. Unusable. It's unusable until the end. Oh, always until until then. Until what? Until the network administrator says, I need to activate rumble on that computer. That's the problem. I think we I think we understand you're running out of time. And I want to make sure that you want to finish the sentence. Yes, because that's what fundamentally what this is about. Until if you have a piece of a CD and you can always make illegal copies. This is the honor system that operates here. But what we were doing is we kept the number of usable pieces of software beneath the number of copies of the licenses that we bought at all times. We never went over that. If we had, we'd infringe. So what you had then, you had, let's say you had 100 computers and you had, you know, you're authorized to use them in 50. And you paid for that. And then you had it. I don't know a lot about computers. All right. So and then you had the same information loaded on with with other information because you want whatever is in each computer to be the same. And you'd load it on another 50. If you if whoever was running this decided that number 51 should should have this system be able to use this system. So what do they do? Shut down number one. Yes. Yeah. Yeah. Absolutely. OK. Yeah. I think. Yeah. Absolutely. Don't at no time do you have computers at no time. The number of computers that that use the system exceed the number of licenses. Right. You control the usage electronically from a central location rather than having to go out and physically fiddle with the computer. If you do, if you do exceed the number, then what happens? You buy more licenses, which is what we did. We bought. We didn't exceed it, but we saw that we were coming up close to our original 2000 and we went out and bought 1600 more. Why would we do that if we were trying to infringe? I think we understand. OK. Thank you. Your Honor, may it please the Court. My name is Todd Gammon. My client is Well Data Incorporated, the plaintiff in the district court, the appellee in this appeal. Your Honor, LSD has raised many issues. I will with the time I have, I'd like to address the fair use issue. And then I'm also prepared to discuss any other issues. Let me ask you a factual question. I buy one of these things. Let's call it a rumba. I got a workstation. Yes. And I put it into my workstation. I'm ready to go. Right. Yes. OK. Let's say my boss decides we're not going to use that workstation for that anymore. Can I uninstall it on my workstation and put it into somebody else's? Under the license agreement, I believe it's paragraph three or paragraph four. There is a provision for transfer. And what happens is that they are allowed to transfer it once every 30 days to another system. Is that exactly what they did by putting this electronic control on it? They just figured out a way to do it electronically by making sure it never exceeded the number of licenses. Strikes me as the same as taking it off a workstation and 30 days later putting a number two. Then put it a number three. Then put it a number 4000. As long as you didn't exceed the number that you bought, why wouldn't that be the same? If I can explain, the facts about this electronic system are not what counsel says. This is not an electronic system that automatically says no more than 2000. Once you get to 2001, you shut off. All the electronic system is, is a password system. It will recognize the password from that workstation. So if they put it on 6000 workstations, they are still capable of accessing a host. But they set it up so it only works with the number of licenses they bought at one time. It's an honor system. There's nothing electronic that limits it to 2000. What do you mean an honor system? In other words, they can. Did you disprove their, their, their theory that they had it limited to only the number of licenses they had purchased? If I can, if I can, if I can address the point. Because I think we have to, what I want to do is get to the point of this issue where they could not be used. The, the, the excessive copies could not be used. There were only two steps that were required by LASD to allow the use once it was installed on the hard drive of the 6000 machines. Step number one is configure the hardware, configure the workstation. Configuration is a standard process used with any computer. If you want to communicate with your printer on your computer, you have to configure your printer. I just did that. Yeah. You tell, basically what you do is you tell the computer, this is the device I want to communicate with and this is how I do it. All right. Second step is they give it a password. That's an internal step to LASD. Now, the point is both of those steps are totally within the control of LASD, not wall data. Now, they can take, they can take the, the 2000 licenses. They can put them on 6000 machines. 6000 machines, so long as it's given a password, so long as it's configured, will access that host. And there's nothing in the system that will shut that down. That's why it's a problem. Now, the evidence that we had that was presented to the court at the summary judgment with the evidence, the testimony of Mr. Salveson as well as Mr. Allison, who were 30B6 witnesses for the LASD, they were asked, why did you put it on all of the machines? Why did you put it on all the workstations? And the reason was for convenience because we don't know which workstation we're going to need to access a host. Exactly. So we want to be able to have it on all of them. Right? The only thing, what's significant about this fact is the configuration process, the first step that we talked about where the IT person has to come in and direct it to which host to work on. He comes into the workstation, types in the key, takes five or ten minutes. That same IT person could load the Rumba software through the CD imaging process. And in fact, the LASD used the CD imaging process to load it. So if in fact you have a workstation, which up to this point doesn't need a Rumba because it's not accessing a host, but now needs it, you're going to have to send an IT person there anyway to configure it. That IT person could at the same time through the CD imaging process load Rumba on at that time. That's not the process they used. For convenience, they took the hard drives and just mass copied it. That is the difference. They had no electronic system for limiting it. What they wanted was convenience. And that is not a fair, you know, I respectfully submit. If they could prove conclusively that they never had a setup that would use more than the number of licenses at the same time, it seems to me they'd win. I disagree, Your Honor. The fact is they had the power to use it. It was totally within their power. Let me give you an example. I'm not talking about power. I'm talking they come in and they, you know, 14,000 boxes of documents, the way these cases look, and they prove everybody agrees, geez, we never used it more than the number of, we never had the number of workstations working more than the number of licenses we have. It seems to me you'd have to prove that they were using it. I disagree, Your Honor. The infringement is in the copying. The infringement is not in the using. Well, maybe it is a fair use if they're not using it more than the 2,000 times they paid for it. But, Your Honor, then I think if we're going to go through a fair use analysis, we look at the fair use factors. We look, is it transformative? Factor number one, is it transformative? Clearly not. They've copied it and they haven't changed it a bit. Is it for a commercial purpose, which is, and I believe that the controlling cases would be the Napster case, would be Triad case. It doesn't seem like this is for a commercial purpose. Because the test, Your Honor, I submit to you. What commercial purpose? The commercial purpose was all to make the thing work easier in the different workstations where they didn't know it was going to be needed. The test for a commercial purpose, Your Honor, under Napster, under Triad, under Harper-Rowe, is LASD getting something for free that they otherwise would have to pay for? If I have 1,000 students and I buy one book and I tell all 1,000 students you're going to have to use the same book, is that a copyright infringement? Have to use it? Yeah. Do they go and you copy it five times? I got one book for all you students. You're going to have to use the same book. No copying. You just have to use the same book. I'll have to come down and line up and read it, basically. Is that appropriate? I'm not making any copies, no. Is that a fair use? It's not an infringement. Is it a commercial purpose? It's not an infringement. Is it a commercial purpose? It's not an infringement. I understand that. But is it a commercial purpose? It is a commercial purpose in the sense that they are not having to buy something they otherwise would have to buy. But it's not an infringement. You're not copying anything. I mean, that's the point I'm trying to make is that there are two, there are two different sort of pervasive points that they're making in the fair use argument, and that is that they somehow couldn't use them. They could use them. They had the full power to use them. Let me give a hypothetical that I used at trial, and I don't mean to bore you on it. Let's assume I have a house that has ten rooms in it. I like to watch television. I want a television. I want to watch it in every room. I go down to Circuit City. I buy one television. I take nine of them. I don't pay for the other nine. I just pay for one. I take the one television. I put it in my living room and start watching it. I put the others in the other ten rooms. Circuit City comes knocking on my door. They say, Mr. Gammon, you have to pay for the other nine. I say, wait a minute. I don't have to pay for them. I'm not using them yet. And they say, wait a minute. It doesn't work that way, Mr. Gammon. And I say, but wait a minute. It's worse than that. It's better than that. I haven't even plugged them in. Or you take one cable outlet in your house and you wire it yourself into ten different rooms. But that's, again, but they're not copying them. Here's their copying for a convenience factor. They want to be of the convenience of having it on every workstation. That's a convenience they have to pay for. Because it's the problem, Your Honor. I'm not sure. Okay. Okay. And that's what their 30B6 would be. So the analogous case in our, here, is what? Triad. Triad. Triad. Napster, I believe, I think would be applicable as well. Well, it all comes down, does it all come down to the, your lack of faith in their honor system. I mean, that is a practical matter. It comes down to the fact that we didn't license them for their use. We, they told them, they have, paragraph two of the license says you cannot copy it. Well, what is, okay. Okay. But here's the, here's the, they say that in the CD analogy, I buy a CD, I have the power to make copies of that CD and to sell them. And if I were to do that. Infringement. I would be infringing. Absolutely. But by, but just by having the power without actually making the copies and selling them, I haven't. No, your analogy though, the analogy here, here's the analogy. If you make the, if you get the CD, right, and you make the copies, and you hold on to the copies, you're infringing. You've made a copy. That's a violation. Well. You've made the copy. No, you've just had, you just had the ability to utilize it. Okay. No, they've made the copy. I understand. There's no question they made the copy. Whether you decide to sell it or not is irrelevant to the infringement analysis. Just making the copy. Just making the copy is the infringement. And the reason why we shouldn't have to rely on the honor system, Your Honor, is because I would suggest there's policy reasons for it. This problem, over-installation of software, and we submitted in part of, as part of our attorney's fees motion, a study, is a problem that pervades the software industry. It costs the software industry hundreds of millions, if not billions of dollars. If they buy one, they use it a hundred dollars. That's correct. Software companies shouldn't have to be in the situation of having to rely on trusting them to do it. That's why you have a license that says don't copy it. They shouldn't have to be sitting there monitoring them. They don't have the ability to monitor it. What about the fact that they bought 200? Bought 200 licenses? Yeah. They bought 2,000 licenses. 2,000. I'm sorry. Originally. Yeah. Originally they bought 2,000 licenses. And then they bought more when they needed it. Well, they bought a different version. Version, yeah. The 1,663 of the ROM, but the mainframe, which is, I mean, that's, if you want to use my television example, it's like saying, going to Circuit City and saying, I'd like to buy that Panasonic over there. I give the clerk my $200, and I don't go down and pick up the Panasonic. I get the Sony Trish on for $500 and take that one home. That's what happened here with respect to that. And so I think that the analysis here, the term, is this a fair use? The question is, what are the four factors? The statute says it. What is the applicable law, the applicable standard under each of those factors? And what was the evidence that was before the district court at the time that it disposed of this fair use defense? That, to me, is the analysis the court should go through. And if you go through that analysis, you start with one, the factor number one, the purpose and character of the use we've talked about. It's clearly not transformative. We have no way to monitor what they do. There's no way. We have no way of doing that. It's clearly not transformative. Getting to the commercial purpose, Your Honor, under Napster, Harper and Rowe, Triad, because they would otherwise have to pay for it, it is a commercial purpose. What they have relied on, the only evidence they submitted to the district court, I mean, if you look at their separate statement, which is in the executive record, 3405 to 3408, you will see that for each of the four, they've laid out each of the four factors in a separate statement. They submitted no evidence with respect to any of those four factors. In the reply brief, they claim, well, they submitted evidence relating to the method of how they installed it and how it was more efficient. And I would respectfully submit that this issue is the infringement is not in how they copied it. The infringement is the number of copies they made. And then they say, well, we didn't need to install it on all the workstations. You know, the other point I'd like to make is using the CD imaging process, which is another fact that was before the court, the district court, they didn't have to copy it onto all of them and keep them dead copies, if you will. They could, because the same person who's going to configure a machine that is going to access a host could use the CD imaging process to then load it onto the system. So there was absolutely no need whatsoever then to make the copy. So even if those issues were relevant to a factor one fair use analysis, they don't hold up. How would you know if they did that? I'm sorry? How would you know if they did? They used that latter system you described. Because Ms. Kevinview testified that they, in fact, did use the system. How would you know if Ms. Kevinview didn't testify? How would the company find out about it? If they're using the CD imaging process? It doesn't make any difference to the company. What? Whether they use CD imaging. CD imaging is a process which is explained to the user in the literature that WallData provides. WallData recognizes that you can use the CD imaging process. That's why when they market the software, they market it as a CD with a multi-use license. That's the. OK. So. In other words, it's marketed and there's a part of the price anticipates this further use? You're licensed for up to a certain number of copies. So in this case, for example, they bought what was called a 250 license pack. The 250 license pack gave you a CD and a license to make up to 250 copies. How they make those copies really is up to them. But they can make no more than 250. And each license. If they made more than 250 copies, how would you know about it? We wouldn't. OK. Each license costs a certain amount of money. Correct. The license to make. You buy a lot. If you buy a 250 license pack, that costs a certain amount of money. I'm under the impression that you could just have purchased one of these. You could. And done exactly what they did. You could. That's exactly right. It paid you how much? 85 bucks? Approximately. OK. OK. So. I missed the last question and answer. I'm sorry, Judge Ferguson. You asked the question, isn't that an honest. Judge Trott's question and your answer. His question was, could they just buy one CD, which has a one copy license, and then just take it and copy it onto as many machines as they wanted to? The answer is nothing. We can't stop them. But if they do it, it's an infringement. So that's the problem the software industry faces that we've talked about. Getting on to the other factors. Factor number two, the nature of the copyrighted work. I believe that the test here, what was the LASD's evidence? Again, no evidence. What is their response? Well, it's utilitarian. I believe the proper standard is whether it is a creative expression. And I believe this court in the Supermarket of Homes for the San Bernardino Valley, also in the AVEN versus MCA case, spoke in terms of creative products, as opposed to informational materials, such as a phone book, a multiple listing. Factor number three, the amount copied. There's no question that the evidence before the district court was they copied everything. See, that factor weighs against fair use. Finally, the effect on market or value. I believe that in the Campbell case and in the Napster case, they hold that if it's a transformative work, market, this factor is presumed against fair use. If it's a commercial purpose, it's presumed. Now, any evidence to rebut that presumption? No. What was the evidence we submitted? Lost revenues of $756,000. So I think when you weigh all the factors, they all would weigh against the fair use defense in this case. This was a jury? The fair use defense was resolved basically on summary judgment. The other issues went to the jury. One last point I'd like to make, that Mr. Martin spoke in terms, spoke about this discussion that was had between Mr. Clare and Mr. Salveson, in which apparently all data was informed of what LAC was going to use. I would respectfully submit that is not a fair use issue. If anything, that's an estoppel issue. The estoppel issue did go to the jury, and they lost on it. Okay. Thank you. If the Court has any other questions. Are there going to be attorney's fees involved in this appeal? Yes, Your Honor. Have those been asked for? It is our understanding, Your Honor, that we would first go to the district court to ask for them. Okay. We would request, however, that the Court would find an entitlement to attorney's fees. So just in conclusion, Your Honors, that there has been no miscarriage of justice or due process violations performed by the district court here. I think the district court should be complimented for the way it handled this case, a case that could have gotten very easily out of control, but for the management of the district court should be complimented, not criticized. Experienced trial judge in the state courts.  So for that reason, Your Honor, we would ask that the judgment be affirmed and that all data be provided as attorney's fees on appeal. Thank you. You have used your time. Do you want to hear briefly? It doesn't matter. Does that mean it's real critical? Probably was a finger-waving conclusion. Okay. I don't think we need that. The Court wishes to compliment the counsel on the quality of argument presented. It was very fine. And the case just argued is submitted for decision. That concludes the Court's calendar for this morning. The Court stands adjourned.
judges: Schroeder, Pregerson, Trott